The next matter, number 26-1039, Pharmaceutical Research & Manufacturers of America v. Peter F. Neronha, et al. At this time, would counsel for the appellant please come to the podium and introduce herself on the record to begin? Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of PhRMA. And if I may, I'd like to reserve three minutes for rebuttal. You may. Thank you, Your Honor. As the Court has heard this morning, there are several problems with Rhode Island's contract pharmacy law. But we think the most fundamental problem is that it expressly and exclusively regulates participation in a federal program in which Congress has concededly given states no role. In point of fact, I don't think Rhode Island denies that if Congress were to eliminate the 340B program tomorrow, its law would cease to have any effect at all. And we think that alone suffices to resolve this case in our favor, because states simply don't have any inherent or presumptive power to regulate the terms of programs that originate from, are governed by, and terminate according to federal law. The Supreme Court has held that for more than two centuries. As it explained back in McCulloch, the states have no power to, in any matter, control the operation of the constitutional laws enacted by Congress. They can insert themselves into federal programs, federal statutes, and the like, only if Congress clearly and unambiguously authorizes them to do so. So whether that principle is understood as identifying the contours of the intergovernmental immunity doctrine or as defining the scope of a uniquely federal field, it leads to the same conclusion, which is this law is foreclosed by the supremacy clause. I've heard a lot today about debates about exactly what the scope of what Congress thought and Congress didn't think and Congress intended here may be. But really, for purposes of this argument, it doesn't matter, because that's coming at it through the wrong lens. It's assuming that Congress has to affirmatively remove the power of states to do something, but when we're in the context of a law that explicitly targets a federal program, it's actually the opposite presumption that applies, that states don't get to play any role unless Congress invites them in. Now, Congress certainly does that in some federal programs. I mean, there's all manner of cooperative federalism programs that Congress comes in and piggybacks off of state law and says, we want the state to administer this program. We want the state to set terms of this program. There are certain federal baselines, but we want the states involved. That's cases like Walsh and Dublino where the Supreme Court was looking. Then you have to look at the statute and say, okay, what is the scope of the role that Congress gave to the states? But here, I don't think it's disputed that there's no role given to states in the 340B program. They don't administer it. They're not asked to set any terms. They're not recipients of any federal funds or any funds really under this statute. They just aren't part of this program. And so when the state comes in and has a law that's not a law of general applicability, this isn't the state saying, here's how drugs should be delivered in Rhode Island writ large. There's particular ways they have to be treated or how we're going to deal with pharmacies as a general matter, but instead saying, no, no, no, the only thing that we want to regulate is what is happening within the scope of this federal program. When somebody is making that offer under federal law that we're required to do through the 340B program to sell drugs at a federally set price, we want to impose some additional conditions and say, even if you're complying with federal law, you have to do a few more things under state law solely because you are a participant in a federal program. That's just not something states have the power to do. Which aspect of the intergovernmental immunity doctrine do you think best supports your argument on that point? Because as I read the cases, and there are not a lot of them by the Supreme Court that apply this doctrine, they're in pretty different circumstances, federal instrumentalities, federal contractors, et cetera. So which part of the doctrine do you think best supports your arguments today? I mean, I think it's both the discrimination and the sort of direct regulation. Discrimination seems pretty straightforward to me because I don't think you could dispute that this statute singles out the 340B program and participants in it. I mean, it doesn't apply. If a manufacturer like Bausch doesn't participate in the 340B program, they don't have to comply with this statute. Well, can I – let me follow up with you about that because I understand the argument that you're making, but one way to think about it, and I think Rhode Island has made this argument, is actually what they're doing is just trying to return it back to generally applicable rules. In other words, manufacturers generally are allowing entities that they deal with to – that the entities, when they purchase drugs, they will deliver them to a variety of places. You've now imposed a set of rules only on covered entities, and so they're just trying to return it back to the background rules. So it's not discrimination. It's actually removal of discrimination in their view. I don't think that works because we will distribute the drugs and deliver the drugs to pharmacies no matter what, with or without Rhode Island's law. What they want to regulate is the price we charge, and they want to regulate it in piggybacking onto the 340B program itself. So if – the way this works in practice is a manufacturer would say, look, we won't deliver those drugs to your contract pharmacy and sell them to you at the 340B price, but we'll do it at the full price. So the background rule – I understand Rhode Island's argument to be generally you're not charging two different prices to people for just delivering to a pharmacy. So you're creating special rules for contract entities to limit – But the only reason there's a different price is because of federal law. But for the 340B program, we'd be charging the same price. We wouldn't be giving the discount in the first place. And so the only reason that to the extent they think there's discrimination on our part, that's a product of the federal statute and the federal program and the fact that Congress has said under certain terms you have to provide a specific price, and that's why this entire thing is parasitic of that federal program. They think that to the extent that Congress didn't say, hey, by the way, you also have to continue to give that price no matter how many covered entities – I'm sorry, no matter how many contract pharmacies and how far flung they are, Rhode Island wants to say, you do. You do have to do that. We think you should. But is that more your federal – that's why I was trying to parse apart your discrimination federal regulation arguments, because that sounds more like your federal regulation argument. And I guess I read the federal regulation cases to be you have to actually be regulating the federal government itself in some way or a contractor or an entity that's representing the federal government. And here you're – that's not what Rhode Island is doing. It's regulating private entities. So I think that – I don't think there's kind of like a hermetically sealed distinction between these two concepts. I mean I'd point to the core civic case from the Third Circuit and the Ninth Circuit GEO Group cases have dealt with sort of the same dynamic of states passing laws that are designed to prevent the government from using federal contractors in the immigration detention context. The Third Circuit viewed that through the direct regulation lens, even though it was a regulation in New Jersey there that applied only to the contractors, not to the federal government. But it said if you're regulating federal contractors for the purpose of – and conversely, the Ninth Circuit viewed that through the discrimination lens and said you passed a law that's specifically designed to target federal – the federal immigration context, and that's discrimination. And I think that goes to show like I'm just not sure when you have targeting in that way that's singling out where you have some – a state law that just by its terms applies only in the context of a federal program. I think you can view it either way, and I'm just not sure a whole lot turns on which way you view it because I do think the direct regulation concept is broad enough to encompass when you're singling out the participants by virtue of trying to get at the agency. I mean in a way you could think about this as like – But I think – I mean this is the struggle. Participants and contractors are quite different because contractors are standing in the shoes of the federal government. They're providing a service on the federal government's behalf. Participants in federal programs are a huge, huge, huge numbers of entities and individuals. And if we accepted your argument, would we be expanding the intergovernmental immunity doctrine by – I don't think so. I mean the only thing you'd be expanding it to say is states can't choose to discriminate on the basis that someone is a partnering with the federal government, which seems like a pretty basic proposition that states shouldn't be able to say we're going to impose special burdens on you for no other reason than because you are partnering with the federal government. I don't know why that principle would cut off at federal procurement contractors. The same injury occurs to the state or occurs to the federal government, whether it's a federal bank that a tax is being imposed on, whether it's the federal – the lessee of federal land in the Phillips chemical case, whether it's a contractor in Washington. Ultimately the point is it all comes back to – Isn't that because in those – all of those cases which I looked at, there was eventually an actual – or there was a direct increase in cost in some way to the federal government, and that's not the case here. And, of course, it makes sense that if you're regulating a contractor that's representing the federal government and you're imposing costs on the contractor, the federal government directly pays those costs. But that's not what's happening here. There is a cost to the federal government in the same way the Supreme Court talked about in McCulloch and the same way the Supreme Court talked about in Buchman, which I think even though it's a preemption case really sounds quite a bit in the same principles we're talking about here. And what the court said in those cases, I mean in Buchman in particular the court talked about, if you allow a state to come in and there it was imposed special conditions on, you know, have special tort law for fraud on the agency, what that does by imposing costs on the participants in the regulatory program, it deters partners for the federal government. It deters people from coming forward and saying I'm going to submit my application for a new drug. Here it deters people from participating ultimately in Medicare and Medicaid. And that's what the court recognized in Buchman, and that's what the court recognized all the way back in McCulloch when it said this isn't just a case about taxes. It said by taxation or otherwise states can't be coming in and posing those kind of burdens because they always inherently come back to the federal government. But I think, and I want to make sure my colleagues can ask you this, again I think it's just a question of expanding the case law because in all those cases it was direct. So you regulate, you know, the federal bank. It's a direct impact on the federal government. That's not, you are saying that people could leave the program. And so far we don't, as far as I know the record doesn't show a great deal of data about that. I understand one manufacturer left and it's not entirely clear based on the briefs why. It just said legislative changes. Whereas in the other cases it was very clear it was direct impact on the federal government itself immediately that the court was dealing with. So I'd say two things. I mean, first, I don't think that's really quite a fair characterization of the Washington case. I mean, the Washington case is a case that said that they were going to allow certain types of benefits to employees of federal contractors. But didn't it mean that the federal government was going to have to pay more? In exactly the indirect way of saying ultimately that's going to lead to some costs on contractors and contractors are not going to want to partner in all of that. It was not the federal government itself must pay these benefits. The court went out of its way to note that the parties all agreed that actual federal employees were not covered by that Washington law. It was only employees of contractors. And it was not a cost right there in the, you know, the execution of the federal contract. It was an ultimate workers' compensation cost. And that's going to be paid to the contractor. And the point was, you know, the court didn't say like we need a bunch of evidence before us to determine exactly is the government going to have immunity from having to pay these charges? Who's going to end up paying this in a literal dollars and cents way? The court accepted the proposition that if you impose special additional costs on the employees, on federal contractors indirectly via their employees, ultimately that's going to harm the federal government, which is the same point the court was making all the way back in McCulloch when it was saying if states can single out federal instrumentalities, the operation of federal law and impose burdens on it, it's ultimately the federal government that bears those burdens. But we don't have contractors here, right? That's why it's another step removed. We just have participants in a federal program. I mean, to be fair, we do have contractors here. I mean, there is a contract. All of this operates through a contract, the PPA. Not contractors that are providing. They are not procurement contractors, but they are operating through a contractual relationship with the federal government that lays out. Here's what you have to do under federal law to get the benefits of participating. You know, you do 340B. We will let you participate in Medicare and Medicaid. So ultimately there are federal dollars very much at stake in all of this. And all of that's connected up. And that's why, you know, it's so essential. And I'm sure the federal government will tell you this when they stand up. But to their interests, to ensure that this federal program that is not even just standalone, but is kind of intertwined and inextricably intertwined with all of these other federal programs, to ensure that the federal government controls that program. It's the one who gets to decide whether you're going to be able to use, you know, one contract pharmacy, many contract pharmacies. Even if Congress may not have spoken to that, it's Congress's prerogative to make those decisions. In this type of context where you have an exclusively federal program, it is not the states that get to come in and fill gaps unless Congress says we would like you to come in and fill those gaps. This goes to a question that I had. And I asked a similar one yesterday, I think. But is it here a mistake to look at who is being regulated, but instead what is being regulated? In the sense that regardless of the status of the manufacturers as a contractor or something else, if the PPA is a contract, I guess I'd like to hear your thoughts on that. Then is what is happening here a regulation of a government contract? So in that sense that there is a direct regulation of the government because it's changing the terms of what the federal government was willing to agree to with the manufacturers? Yeah, absolutely. I mean, we think what the state is doing here is regulating both the terms of the contract and the federal contractor, because it is regulating what we do under the terms of the contract. What the state is essentially saying is if you want to be a participant in this federal program, and when you make your offer, you can't have certain conditions. When you make the offer that you are obligated under your federal PPA and under a federal statute to make, you can't have conditions that Rhode Island doesn't want you to have. And so I think this really is altering the terms of the PPA itself. And, of course, because that's a contract and it's singling out, it only covers manufacturers who have a PPA. It is, by definition, only covering parties who are in a contractual relationship with the federal government. I suppose one response is, well, it's not changing the terms of the contract. We're just doing something separate alongside. Does that? I don't think that really works because essentially what they're doing is saying if you comply with, you know, if you do your offer in a way that's compliant with federal law but not Rhode Island law, you're going to face penalties. So that's essentially, you could think of it as like they're adding their own breach of contract remedy into the PPA. They're saying if you don't do what we want you to do under Rhode Island law, maybe, you know, you're not going to get kicked out of the 340B program, but you are going to face some consequences, some very serious consequences under Rhode Island law. And as they've been very clear, the way to avoid those consequences is to drop out of the federal program. And when you have a state saying the way to avoid the state law is to drop out of a federal program, I mean, boy, that sure sounds to me like a concession that the state has invaded federal territory, whether you think of that through intergovernmental immunity or think of that through a federal field. You know, and I think you kind of can get to the same place by saying it's just in the nature of a federal program that Congress designs the contours of that program. And once that program is set, that is the field. And that is the field that they are regulating, the terms of their statute, which Buckman says you look to what the state is doing. You know, Buckman involved a generally applicable state tort law. But when the court defined the field, it looked at what the state was applying that tort law to and said broad on federal agencies is not an area that states have any inherent traditional authority to regulate. And the court said for that reason alone, not only was there no presumption against preemption in Buckman, but the statute was in fact preempted because it was singling out the field that was being singled out in that context, was regulating that relationship that arose from, was governed by, and terminated according to federal law. And that's exactly what we have here. Thank you. Thank you. Thank you. At this time, would counsel for the United States please introduce himself on the record? He has a five-minute argument. May it please the court, Maxwell Baldy for the United States. I know we've been here for a while this morning. I want to try to jump right into some of the concerns I just heard. Our position is a basic one that I think lies at the heart of the Supremacy Clause, which is that the Supremacy Clause forbids states from interfering with federal functions by imposing discriminatory regulations based on federal status. And I think that principle applies regardless of subject matter and regardless of the exact relationship between the federal government and the participants. And I have a couple of examples that I think might, you know, I think I will say them, and the instinct has to be, well, a state surely can do that. And I don't think these are distinguishable from the situation we have here. So, Social Security. Social Security beneficiaries, people who receive Social Security checks, are participants in that federal program. It's the third rail of American politics now, but there was a 15-, 20-year period where there was a real push to repeal it. If in that period a state had said, we're going to impose a surtax only on Social Security income, not, you know, we have taxing power, but we're going to impose a surtax on Social Security income to disable the program, surely they can't target participants in the federal program that way. Or federal grantees. If you have a – states have plenary power to regulate zoning, but a state couldn't increase, say, the minimum unit size for only housing projects built with a federal affordable housing grant. Whether they think that is good or bad, whether they think it benefits the federal program or not, that sort of targeted discrimination is something that isn't within a state's power. States can impose generally applicable laws. Rhode Island could have imposed a generally applicable law here, although I think, as my friend Mr. Owen pointed out, they might run into some – that might exacerbate their takings issues. But what they can't do is target federal participation, and that's what they've done here. And I guess I'd like to also spend a moment on sort of what the federal interest is here, why it matters, why we're here. Participating in Medicare and Medicaid is a voluntary bargain. As long as it remains profitable, manufacturers are likely to continue participating. But if the costs outweigh the benefits, then these programs are going to collapse. I know we talked a little bit about Bausch Health and sort of its one example, and they said it was regulatory changes. They didn't say why. I'm not saying that Bausch pulled out because there were state laws regulating it. But for decades, participants in Medicare and Medicaid, both providers and pharmaceutical manufacturers, have said this isn't really voluntary. It's way too lucrative. We could never leave. And the federal government has said it's voluntary. You can make an economically rational decision. But the fact that a manufacturer is willing to pull out I think is powerful evidence that, like, participants are really considering the costs and benefits and making economically rational decisions, and that's a real concern. But whether these state laws themselves, you know, if they're imposed in 50 states, and I think there's 22 some odd on the book so far, if these state laws themselves create the problem or whether it is just that the imposition of additional costs on participation constrains the ability of the federal government and of HHS in figuring out what else it can use Medicare and Medicaid participation as, you know, the sweetener to get additional concessions from pharmaceutical manufacturers, these are all real federal concerns. One question for you on, and I'm not 100% sure kind of exactly how much kind of congressional intent or the purpose behind the statute, the 340B statute, how that plays in. But what in the government's view was the purpose of the 340B program? What was it designed, how, you know, how much was it designed to address? So, you know, we think that the legislative history is largely that Congress inadvertently created a problem with the Medicare drug rebate, Medicaid rebate program. The unintended consequences issue. Exactly. And Congress intended to solve that and create a means of subsidizing a group of providers, which were initially mostly federal grantees, and now sort of by, you know, share of the market are largely hospitals that have a disproportionate share of low-income patients. So subsidy was certainly the goal, but it was subsidy sort of within certain terms. But I think if we're talking about this in terms of not sort of the preemption analysis, but the intergovernmental immunity analysis that flows from the supremacy clause, that's just not relevant because as the Supreme Court explained in Dawson, whether the state's intention doesn't matter. If the state wants to further the purposes of the federal program or inhibit the purposes of the federal program, that's not relevant. The state can't be in the federal government's lane. Can I ask you, I am trying to separate the preemption versus the intergovernmental immunity, but in terms of this discrimination argument under intergovernmental immunity, can you respond to the question I asked your co-counsel, which is why is this discrimination if all Rhode Island is doing is actually trying to set the same terms for manufacturers that would normally apply in the state? In other words, you can't, when you sell your drugs, you let everybody else deliver those drugs to the pharmacies they work with. So actually they're trying to return, instead of discriminating against people with federal status or entities of federal status, as I think you put it, they're just trying to return it to what the background rule is. And of course, in their view, this is because there's congressional silence on it, which is how it then all goes back to preemption and congressional intent. But can you just respond to the discrimination point? Why is this discrimination? It's discrimination because it imposes a burden on 340B participating manufacturers that don't exist on other ones. But that's exactly what I'm saying. It doesn't under that framework because normally the manufacturers sell their drugs and they don't impose any delivery limitations. They don't say we will only sell you these drugs for the commercial price if you only have one contract pharmacy. They don't do that. So Rhode Island says, therefore, we want the background rule that we have in the state to apply to the participants in this federal program too. So they're not discriminating against people with federal or entities of federal status. They're just returning it to the background rule. Let me try three responses to that. The first is that I would take issue with the premise that it is a background rule. I think it is maybe a common way of doing business or a background business principle, but there isn't a sort of common carrier rule in Rhode Island that says you must make all of these deliveries. So that's why it's not a generally applicable law. If Rhode Island had passed such a law, this argument wouldn't work. There might be other problems. I think the second point is that the fact that they are specifically targeting this one program and what happens within it is it exacerbates the problem. It doesn't make it better to say that, well, we're only trying to insert ourselves in the 340B program. And the third point I would make is sort of in terms of the differences, part of what's happening here is sort of the mechanism by which 340B sales are effectuated in sort of this replenishment model. So I don't actually know what would happen if a non-340B provider clinic said to a drug manufacturer, oh, we're going to buy drugs from you, but we also want you to deliver drugs to six different Walgreens locations, and we're going to keep title to them. And we'll figure out, you know, we'll do some complicated accounting stuff. I don't know what the manufacturer would say. I suspect they'd say, well, just deliver drugs to Walgreens. These unique sort of concerns exist within this program because it's about, you know, whether the drugs are sold or not at the 340B price and within the terms of this program. But surely it can't be the case that if you gerrymander your law narrowly enough so that it only fits within the federal program, that that means you're not targeting or discriminating within the federal program. Can I ask you a field preemption issue now? So we're moving away from intergovernmental immunity and congressional intent is critical. From the federal government's view, why is it wrong to conclude that there's just silence on these issues and that Congress was just doing these narrow things? It was solving the unintended consequences by setting the price, creating the no abuse provisions, and that's it. And it didn't think through how many contract pharmacies or zero or one or ten or whatever the number should be. And so why isn't the solution then for the manufacturers? I mean, this follows up on Judge Dunlap's who decides. Why isn't the solution for manufacturers to go back to Congress and say this is a problem for us? It's going to make it harder for us to stay in the program. Can you actually go ahead and legislate and put in place something that says very clearly that we can have this limit? If our view is that there's silence on it, why would that be wrong? So I want to be careful here because we haven't taken a position on sort of field preemption. We've only advanced our sort of intergovernmental immunity and conflict arguments. And I can't go beyond sort of the arguments the SG has authorized. But what I will say is within the framework that we sort of articulated this argument, I think my friend Ms. Murphy was right that there's a clear statement rule to abrogate intergovernmental immunities if silence cuts the other way. Well, but that's just in the intergovernmental immunity. You can't comment on the – that's fine. Yeah, on field, I just – we have not taken a position on that. I understand. Thank you. Yes. Thank you. Thank you, counsel. At this time, would counsel for the affiliates please introduce themselves on the record to begin? May it please the court. James Argwin on behalf of the Rhode Island Attorney General and Auditor General. Let me start with the treatment of silence. And I think the analysis that we heard from Farmers' Council has things precisely backwards. If congressional action leaves an area and covers it in a way that addresses the needs that the federal government saw fit in the context of 340B, that was the pricing at which drugs are sold, and leaves other areas unaddressed, there need not be any kind of explicit invitation, let alone a clear and manifest invitation, that the states have the authority to intervene and add – address additional needs that may meet the demands of society or events that occur. It's precisely the opposite. It's presumed that the states can regulate. But I think she was arguing about intergovernmental immunity, which she says is a different set of rules. And so you're not – you wouldn't be doing the analysis that you just started with if you're in the intergovernmental immunity doctrine space. Which is exactly where this new theory of intergovernmental immunity came from. And I'll address that in a minute. But the reality is what they're trying to use that as, a vehicle to bypass the usual presumption against preemption that applies to state laws that addressing the state's exercise of historic and traditional police powers. And the usual rule is that just because Congress has passed a program doesn't mean the states can't add additional requirements or impose additional obligations to meet the needs that are state laws. So long as they don't conflict with the federal statute or the federal objectives. Now the intergovernmental immunity doctrine evolved in an entirely different context than what arose here. And what's at issue here. But I think the first step in that is we contend that this argument has been waived. And it is not properly raised by the Department of Justice, which was not a party below. Because the arguments were not advanced by PhRMA. And what I will present is what I heard from counsel for PhRMA was, you know, these theories are not hermetically sealed. But this court has never required district courts to call through the record and pull out or develop arguments that a party has not up front and squarely presented. The argument that PhRMA presented below was based exclusively on the spending powers. On the theory that because this was spending powers legislation, it automatically preempted state law. That's exactly how they presented the claim. Spending power and only spending power didn't mention or develop any argument related to intergovernmental immunity. And you can't fault the district court for not addressing an argument that wasn't squarely presented. And one point I would point out specifically in their motion for a preliminary injunction. PhRMA framed its argument as this specifically. Simply put, Chapter 288, the state law at issue, is an unlawful effort to regulate and impose new conditions on Congress's 340B spending power program. That was the fundamental defect they identified at ECF number 11-1 page 17. And in the same motion, they repeated it. But don't they, I think a couple pages before that, 15 to 16, don't they literally say, under established principles of intergovernmental immunity, a state cannot directly regulate the activities of the federal government nor impose obligations specific. And it goes on. But that was just a passing reference supported by a string of citations under a heading about spending power as an automatic preemption. Framed with the kind of catch-all summary arguments of the fundamental issue is it violates the spending power, which were repeated in their brief at 11 at page 17 and 14 presented to the district court. Their argument below also had a list of all these cases that included areas of allegedly unique federal interest, mostly listed in string citations with some paratheticals. Do we really expect the district court to wade through, which in this case were hundreds of pages of briefing, and call out, oh, they're talking about not the spending clause as they said, but this new theory, this very rare theory, I would add, on intergovernmental immunity. And so for those reasons, this argument is not preserved. It wasn't up front and squarely presented to the district court. The district court resolved this case on the argument that was presented, which was that the spending clause automatically preempts all state law. And that's the way the case was disposed of. But even if there was no waiver, the reliance on intergovernmental immunity fails, because they are not government instrumentalities. I mean, even if they're not contractors performing a service or an obligation on behalf of the federal government, they're not performing anything for the federal government. They're selling drugs, and they're making money off selling drugs, including to the covered entities, albeit at the pricing required by the 340B program. They're engaged in their usual business. There's no federal instrumentality here. There's no basis like any of the cases on which they rely, where, for instance, the Washington case, the Boeing-Movisagi case, or the Boyle case, all of those involve contractors who stepped into the shoes of the federal government to perform work for the federal government on behalf of the federal government. And those cases are clearly distinguishable from this situation. They're not doing any sort of federal work. They're doing their own business, meaning that just because they signed a PPA, which we agree is a contract, doesn't mean they automatically became federal instrumentalities. Again, it doesn't require them to do anything more. Let me follow up on that then a little bit. If we set aside kind of the status, this is similar to the question that I asked of opposing counsel. If you set aside kind of status of the manufacturers, what about the separate question of more, I guess, more of a direct regulation theory of kind of altering the terms of the contract in some way? Well, I think that's the other area where that's their argument about the state law targets the federal program, the 340B program, and or participants in the federal program. But that's not at all what the state law is doing. The state law is addressing a situation that arose when manufacturers, starting in 2020, some manufacturers starting imposing these conditions for the delivery of drugs to covered entities. The state is responding to the conduct of them imposing these discriminatory practices against only covered entities who purchase drugs. They do not impose these restrictions on any other drug purchaser. It is only covered entities. Well, is that because of the federal program? Well, it's not – there's nothing that would limit them to doing the same policies for any sale of drugs, but they don't. But the price issue only arises – I mean, what it seems like manufacturers are trying to do is control, you know, the amount of – how they're affected financially by this program, and they're imposing that limitation to balance the cost to themselves. And so that only arises in the context of the 340B program, unless I'm mistaken. It's true that the pricing discount applies only to those participating in the 340B program. Those are the only ones – sales to covered entities for use by their patients are the only ones that are subject to the price discount. But certainly not all manufacturers have imposed these restrictive conditions. It's only a subset of manufacturers who were doing it, and it's only a subset of manufacturers who started doing it roughly in 2020. Your opposing counsel says that if the 340B program did not exist, if it were concluded for whatever reason tomorrow, your statute would have no purpose. How do you respond to that? And therefore, what you're doing is just regulating the program, you know, direct regulation of the program or regulation of the contract, as Judge Dunlap asked. So how do you respond to that? I mean, the statute wouldn't be serving any purpose if the 340B program were terminated, would it? There would be no discount pricing, but by definition, then, if there were no sales subject to the 340B program, there would be no discrimination against the 340B program entities that are able to purchase drugs at these prices. But that's another way of saying your statute wouldn't be doing anything. No, not really. It's really saying that what we're aimed at is the conduct. It's not mere participation in the 340B program. There were no state laws on delivery until some of the manufacturers started imposing these restrictive conditions on ship-to arrangements or delivery arrangements. No, I understand, but they impose the conditions within the confines of the 340B program. They do impose them within the confines of the program. Let me ask you this way. Let's assume that Congress ended this program tomorrow. What would your statute be doing two days later? When would you be applying it? The other aspect of the Chapter 288 is that it also applies to the public reporting on covered entities themselves. I mean, all of the entities under the statute are involved in some way, shape, or form in the 340B program, but they're not all manufacturers. There's insurers, there's pharmacy pricing, pharmacy, I forget the term, PPMs, pharmacy pricing managers, or managers, and also, of course, the covered entities themselves. It's not just targeting manufacturers, because anyone who engages in this sort of discrimination against safety net providers who are participating in the 340B program is subject to the state laws, including what Chapter 288 specifies as an unfair and deceptive practice. If the entire program were eliminated, the utility of the law is probably also not relevant. But until that happens, there's a pressing societal need that the legislature wanted to address to ensure the health and safety of Rhode Islanders who rely on these covered entities to obtain services. And that's what the law is targeting. It's targeting conduct, not pricing and not manufacturers. It's only those manufacturers who engage in this kind of discriminatory or unfair or deceptive trade practice under state law. And that is entirely different than the ADR system that's set up under the 340B program, which is focused exclusively on price. You know, the disputes about whether the most favorable prices or the ceiling price established by the program was honored. The Chapter 288 deals with did you discriminate or interfere with a contract pharmacy arrangement between a covered entity and their pharmacy dispensing the medication to patients? If that's the case, then that could be an unfair and deceptive trade practice under state law. A completely different inquiry. And as the Fifth Circuit and Eighth Circuit found, they operate in completely different spheres. There's no overlap. One other point I wanted to make about DOJ's position, they mentioned that, you know, first of all, they cannot present an argument on intergovernmental immunity if it wasn't presented by a party. The Supreme Court just last week affirmed the party presentation theory and actually reversed the Fourth Circuit for ruling on an argument that had not been properly presented by the parties. That's in the Dublino case issued just last week. And that's our fundamental point with regard to DOJ's amicus brief in this case. They can't come in at the last minute and raise an argument that hasn't been preserved by one of the parties to the litigation. The other point they also mentioned was disincentives in terms of participation in federal programs, including Medicaid and Medicare. But there's nothing to show that state laws like Chapter 288 disincentivize manufacturers from participating in Medicaid or Medicare due to any additional burdens that Chapter 288 allegedly imposes on them. As I said before, when manufacturers sign the PPAs, they commit to offer 340B discounts on all outpatient drugs purchased by covered entities for the use of their patients. Manufacturers knew full well that that was the requirement imposed by federal law when they signed the PPAs and entered into participation with a 340B program. And there's nothing that insulates private participants in a federal program from the operation of federal law, the operation of state laws. Particularly when they're here, they're relying on, they want to use a preferred distribution method that goes to one pharmacy as opposed to more than one pharmacy. Those are matters, the distribution of drugs to patients of healthcare providers in Rhode Island is a subject of state regulation. That was something that federal regulators knew from the beginning. And that's something that they recognize, that the use of contract pharmacies was essential to the program's success and was a matter reserved for traditional principles of state contract in agency law, which is all Chapter 288 is focused on to preserve that those provisions are honored. And I think we've already heard that the one example that had been proffered, the Bausch withdrawal, had nothing to do with these state laws. It was all focused on, the only reason specifically referenced was the Inflation Reduction Act and similar pricing statutes enacted by other states. But that has absolutely nothing to do with any of the provisions here under Chapter 288. So unless there are further questions, I'll rest on my brief. Thank you so much. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce herself on the record? She has a three-minute rebuttal. Erin Murphy for Pharma. If I may first briefly address preservation, I find this argument a little bit baffling. I mean, we explicitly referenced the Intergovernmental Immunity Doctrine in our opening and reply brief in our PI briefing. We quoted Washington, a case that has nothing to do with the spending power, for the proposition that states cannot discriminate against those who deal with the federal government. The state itself understood this. On page 19 of its opposition, it responded to that argument and said why it didn't think there was discrimination under Washington. So the state clearly understood that we were not making some argument about the spending power, which we don't have a spending power claim in this case. We have a supremacy clause claim in this case. And for good measure in our reply brief, we specifically highlighted for the district court that we were raising a distinct argument that hadn't been considered in the court's earlier rulings in the other cases. So it's just I don't see how it could seriously be argued that we didn't preserve this argument below in our briefing. I basically heard the state acknowledge that its law really serves no purpose other than to regulate the 340B program. I mean, this is not a law that says no manufacturer may charge more if a hospital wants drugs delivered somewhere other than the hospital. It says only if you are in the 340B program, if you are making your 340B offer, only in that circumstance does a manufacturer have this obligation to deliver drugs that were sold and really, in effect, sell drugs at a particular price, no matter where the covered entity wants them gone. The program is entirely parasitic of the 340B statute. And that's the fundamental problem here. That's just not something that states can do. In this context, you know, there is a clear statement rule that goes in the other direction. That's what intergovernmental immunity is all about. And even in the preemption context, the court has made clear that when you're dealing with inherently federal relationships, that's the way Buckman put it, that's a context where there is no presumption in favor, no presumption against preemption. The last point I would just make is, you know, there's kind of been quite a bit of discussion about what to make of silence here and how to think about what Congress thought about contract pharmacies. I mean, the state itself has acknowledged repeatedly this morning that the federal government has always cared about the use of contract pharmacies in this program. This isn't some, like, completely extraneous matter that HRSA has never had anything to say about. And both the D.C. Circuit and the Third Circuit actually said the statute does speak to this in requiring the bona fide offer. And, of course, it has to speak to this. Because the reason that HRSA very first way back in the day put out guidance discussing why it was okay to use at least one contract pharmacy was because one of the core restrictions in this statute is no diversion. And HRSA has to be able to control the understanding of who can you send these drugs to, how can they be delivered, where can they go, consistent with that congressional restriction on diversion. That's why this is something HRSA has always cared about. HRSA just didn't, I mean, for a time it adopted the policy the state would prefer. It was overridden. That is not the policy of the federal government and the states don't get to come in and override and place that. Thank you so much, Counsel. Thank you. That concludes argument in this case.